

2011 JUN -2  AM 8: 59

SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENIFER WILLIAMS,<br><br>                   Plaintiff,<br>vs.<br>LOCKHEED MARTIN<br>CORPORATION,<br><br>                Defendant. | CASE NO. 09cv1669 WQH (POR)<br><br>**ORDER** |

HAYES, Judge:

       The matters before the Court are the Motion for Class Certification (ECF No. 76) filed by Plaintiff Jenifer Williams ("Plaintiff") and the Motion to Strike the Expert Report of Miles E. Locker (ECF No. 77) filed by Defendant Lockheed Martin Corporation ("Defendant").

### PROCEDURAL BACKGROUND

       This is a putative class action filed by Plaintiff Jenifer Williams on behalf of herself and certain employees of Defendant Lockheed Martin. On July 31, 2009, Plaintiff initiated this action by filing her Complaint. (ECF No. 1). On September 9, 2009, Plaintiff filed her First Amended Complaint. (ECF No. 6). On November 19, 2009, Plaintiff filed her Second Amended Complaint ("SAC"), which is the operative pleading in this case. (ECF No. 14).

       On October 29, 2010, Plaintiff filed a Motion for Class Certification and on November 3, 2010, Plaintiff filed an Amended Motion for Class Certification. (ECF Nos. 74, 76). On November 5, 2010, Defendant filed a Motion to Strike the Expert Report of Miles E. Locker. (ECF No. 77).

1       "Plaintiff brings this class action on behalf of themselves (sic) and a California Class

2 consisting of all individuals who are or previously were employed either by Defendant

3 Lockheed Martin Corporation in a staff position classified as exempt with the title Systems

4 Administrator, Network Data Communications Analyst, Network Data Communications Senior

5 Analyst ... in California during the period beginning July 31, 2005 and ending on the date as

6 determined by the Court...." (ECF No. 14 at 4). Plaintiff alleges that Defendant improperly

7 classified Plaintiff and certain the other employees as "exempt" from provisions of state and

8 federal labor law. *Id.*

9       Plaintiff asserts seven claims for relief as follows: (1) unfair competition; (2) failure to

10 pay overtime in violation of state law; (3) failure to provide wages when due; (4) failure to

11 provide meal and rest periods; (5) failure to provide accurate itemized wage statements; (6)

12 failure to pay overtime in violation of the federal Fair Labor Standards Act ("FLSA"); (7) for

13 civil penalties pursuant to California's Private Attorney General Act.

14 **CONTENTIONS OF THE PARTIES**

15       Plaintiff seeks class certification for her first through fifth claims under the California

16 Labor Code and the California Business & Professions Code § 17200 *et seq*. Plaintiff defines

17 the proposed class as "all those individuals employed by Defendant Lockheed Martin who

18 were classified as exempt and worked in a position with the title Systems Administrator or

19 Network Data Communications Analyst [hereinafter referred to as ('Computer Technicians')][1]

20 during the period July 31, 2005 to the present (the 'Class Period')." (ECF No. 76-1 at 8

21 (internal quotations omitted).) Plaintiff contends that common issues predominate on the

22 grounds that "the primary tasks of all class members, irrespective of customer or location, are

23

24      [1] Although Plaintiff has identified the job titles of Systems Administrator and Network
Data Communications Analyst ("NDCA") in the Motion for Class Certification, Plaintiff was

25 employed as a Network Data Communications Senior Analyst ("Sr. NDCA") and Plaintiff has
submitted evidence regarding the job titles System Administrator, NDCA, and Sr. NDCA in

26 support of the Motion for Class Certification. In addition, the Complaint lists the job titles of
Systems Administrator, NDCA, and Sr. NDCA among the job titles that comprise the class.

27 Thus, the Court construes Plaintiff's Motion to seek certification of a class to include all those
individuals employed by Defendant Lockheed Martin who were classified as exempt and

28 worked in a position with the title Systems Administrator, NDCA, or Sr. NDCA during the
period July 31, 2005 to the present.

1   to support the infrastructure of multi-user computer systems[]" and "the primary job duties

2   involved ... installation, configuration, responding to HelpDesk tickets and other requests for

3   troubleshooting to maintain the computer systems." (ECF No. 76-1 at 10, 14).   Plaintiff

4   contends that the "trier of fact need only consider the finite list of tasks performed by the

5   members of the class to decide if the class members have been misclassified." (ECF No. 82

6   at 7). Plaintiff contends that exemption can be adjudicated without individualized proof as to

7   the amount of time class members spent on various tasks because the proposed class members

8   do not perform work directly related to management policies and general business operations

9   or exercise judgment or independent discretion on matters of significance.

10          Defendant contends that common issues do not predominate as required by Rule

11   26(b)(3).   Defendant contends that the employees performed "different and variable duties

12   at different locations, for different business areas, ... for different internal and external clients,

13   and involving different computer and network systems." (ECF No. 80 at 7).   Defendant

14   contends that terms like installing, configuring, and troubleshooting are broad terms denoting

15   tasks which include varying levels of complexity and which occupy varying percentages of a

16   proposed class member's time.  Defendant contends that individual inquiries will include "the

17   job duties actually performed by each individual, time spent on each duty, and the importance

18   of each duty to [Lockheed Martin] or one of its customers," and "whether the individual's job

19   duties involved customary and regular exercise of discretion and independent judgment." *Id.*

20   at 23.[2]

21                          **FACTUAL BACKGROUND**

22          Plaintiff has submitted Lockheed Martin's job descriptions for the job title Systems

23   Administrator, NDCA, and Sr. NDCA.  The Systems Administrator's job description states:

24          Maintains smooth operation of multi-user computer systems, including
            coordination with network administrators.  Duties may include setting
25          up   administrator   and   service   accounts,   maintaining   system
            documentation, tuning system performance, installing system wide
26          software and allocate mass storage space.  Interacts with users and
            evaluates vendor products.   Makes recommendations to purchase
27

28          [2] Defendant has also made several objections to the evidence submitted by Plaintiff.
     Any objection to evidence cited in this order is overruled.

1  hardware and software, coordinates installation and provides backup
   recovery.  Develops and monitors policies and standards for allocation
2  related to the use of computing resources.

3  (ECF No. 76-5 at 441).  The NDCA job description and Sr. NDCA job descriptions each state:

4  Defines network communications and designs and implements
   solutions within existing network.  Manages load configuration of
5  central data communication processor and makes recommendations for
   upgrade of data networks.  Evaluates and reports on new analog and
6  digital communications technologies to enhance the capabilities of the
   data network.  Provides problem resolution for all hardware and
7  software elements of the data communication network and ensures the
   availability of the data network.  Proposes solutions to management to
8  provide all data communications requirements are based upon future
   needs and current usage, configuring such solutions to optimize cost
9  savings.  May coordinate network-oriented projects.

10 *Id.* at 442-43.

11    Plaintiff has submitted the declarations of ten of the approximately sixty-four proposed

12 class members who state that as part of their actual duties they primarily performed "the same

13 repetitive tasks of installing, configuring, maintaining, monitoring, testing, and/or

14 troubleshooting computer equipment, applications and/or hardware." (ECF No. 76-5 at 283,

15 Michael Carvalho Decl.); *see also id.* at 288, Barbara Emerson Decl.; *id.* at 293, Dana Hawkins

16 Decl.; *id.* at 298-99, Cecilia Knapp Decl.; *id.* at 310, Michael Meyer Decl.; *id.* at 315, Steve

17 Motoike Decl.; *id.* at 320, Devin Swanick Decl.; *id.* at 325, Roy Usry Decl.; *id.* at 330,  Lars

18 Vedvick Decl.; *id.* at 335, Sylvia Wood Decl.   The declarations state that during their

19 employment, proposed class members observed "the work performed by [their] fellow

20 co-workers. As a result, [they] have observed that the other employees in [their] group all

21 performed substantially similar tasks as [they] have described ...." (ECF No. 76-5 at 284,

22 Michael Carvalho Decl.); *see also id.* at 289, Barbara Emerson Decl.; *id.* at 294, Dana Hawkins

23 Decl.; *id.* at 299, Cecilia Knapp Decl.; *id.* at 311, Michael Meyer Decl.; *id.* at 316, Steve

24 Motoike Decl.; *id.* at 321, Devin Swanick Decl.; *id.* at 326, Roy Usry Decl.; *id.* at 331, Lars

25 Vedvick Decl.; *id.* at 336, Sylvia Wood Decl.

26    Plaintiff has submitted the deposition of Gennaro Riticelli who was designated as the

27 person most knowledgeable of the job duties for two proposed class members in the Enterprise

28 Business Services group with the job titles of NDCAs.  (ECF No. 76-5 at 3).  Riticelli

09cv1669 WQH (POR)

describes installation as involving ordering equipment, receiving equipment, tagging equipment, unboxing equipment, testing equipment, configuring equipment, deploying equipment, and cabling equipment. *Id.* at 180-81. Riticelli states that configuration is a "very broad term" and Riticelli describes configuration as determining appropriate connections and operating systems within routers which "could be as simple as maybe two lines of code or it's complicated with thousands of lines of changes, software changes." *Id.* at 183-84. Riticelli states that configuration could include "configuring ... solutions to optimize cost savings" and "coordinating network-orientated projects." *Id.* at 214. Riticelli states that NDCAs perform network planning and design which involves "sit[ting] down with the clients to review their requirements for new facilities, along with the facilities people, ... [and] determin[ing] the correct equipment that's needed, have that reviewed, purchase the equipment, evaluate, install, plan that out, execute it, [and] initiate it." *Id.* at 176. Riticelli states that Defendant uses a change control procedure and describes it as "a process ... to notify a group of people that a network -- a network change is going to happen. And that's regardless of any network change. That is not just network but anybody else in the computer world that needs to make a change." *Id.* at 187. Riticelli states that NDCAs know that security guidelines must be met while they are configuring networks because "[t]here's certain instructions that we have that certain things can't happen within the switch, accessibility." *Id.* at 193.

Plaintiff has submitted the deposition of Julia Brown who was designated by as the person most knowledgeable of the job duties for eight proposed class members in the Enterprise Business Services group with the job title of System Administrator. (ECF No. 76-5 at 2). Brown describes installation as involving unboxing equipment, testing equipment, and "making sure patches are up to date, making sure the latest version of the software is on there, [and] analyzing the design and any problems ...." *Id.* at 46. Brown states that configuration is "an analysis tool" and configuration involves "a lot of different things ... It could be just the whole design of how the whole system is going to work together...." *Id.* at 49. Brown describes troubleshooting as involving a four step process of identifying a problem, resolving a problem, "analyzing ... the root cause of the problem[]," and documenting the root cause. *Id.*

1   at 51.   Brown states that as policies are drafted, "input is requested [from System

2   Administrators] as a normal part of instituting or writing any policy or even changing a

3   policy." *Id*. at 82. Brown states that Defendant uses a change control procedure that is, "really

4   less of an approval, even though an approval comes out on the back end as more of a way to

5   communicate ... what needs to be changed and why." *Id*. at 71.  Brown states that there are

6   "internal audits, external audits, [and] government audits." *Id*. at 66.  Brown also states:

7   "There's all sorts of audits [that the corporate internal audits group performs with respect to

8   the servers]." *Id*. at 67.

9        Plaintiff has submitted the deposition of Gregory Dotson who was designated as the

10  person most knowledgeable of the job duties for eight proposed class members who support

11  the Army Corps of Engineers ACE-IT group with the job titles of System Administrator,

12  NDCA, and Sr. NDCA. (ECF No. 76-5 at 2).  Dotson describes installation as including "the

13  configuration, the securing of the operating system, preparing it for on (sic) the network,

14  installing in applications that may reside on that server, and testing and ensuring that the server

15  is performing as intended." *Id*. at 90, 105.  Dotson states that employees perform "problem

16  resolution" which includes noticing a problem, "thoroughly diagnosing the issue" using data

17  from many sources, "deveop[ing] a plan," and "implementing the plan." *Id*. at 98.  Dotson

18  describes maintenance as observing "key performance metrics of the server over a period of

19  time to identify problems and when you identify those issues, ... and then you would have to

20  take that knowledge and understanding and develop a plan for addressing it." *Id*. at 101, 108.

21  With regard to the change control procedure utilized by Defendant, Dotson states that:

22          change request [forms] can be initiated ... by anyone, and then it is
23          reviewed. It's assigned to a change approver, and the change approver
            makes the initial determination as to whether it's something that needs
24          to be forwarded or not or does it need to go to the board or what level
            of change is it, is it -- you know, does it impact the enterprise, does it
25          impact, you know, smaller segments.

26  *Id*. at 110.  Dotson states that with regards to client requirements for backing-up files:

27          They have guidelines, but not specific requirements. So again, it's very
            -- it's variable dependent and it requires some analysis by the systems
28          administrator working very closely with the customer to determine, you
            know -- again, the criticality of the data is going to define or drive how
            often you back it up, where it's stored, how long it's stored, et cetera.

*Id.* at 100.

Plaintiff has submitted the deposition of Michael Fabel who was designated as the person most knowledgeable of the job duties for seven proposed class members in the Space Systems Company group with the job titles of System Administrators. (ECF No. 76-5 at 3). Fabel describes configuration as involving an audit of systems to locate dozens or hundreds of services and turned off or closing services that are not needed. *Id.* at 253. Fabel describes troubleshooting as a "problem diagnostic function[.]" *Id.* at 263. Fabel states that employees "respond to customer requests to evaluate upgrading servers and software ...." *Id.* at 241. Fabel states in his deposition that employees are "involved with training, documenting operations processes, providing documentation to users on how to use a particular environment." *Id.* at 241. Fabel states that NCDAs, "follow[] the policies and guidelines dictated by the Department of Defense ... to ensure that [the] servers [they] manage[] are properly maintained from a classified standpoint." *Id.* at 252.

Plaintiff has submitted the deposition of Daniel Melendrez who was designated as the person most knowledgeable of the job duties for thirty-four proposed class members in the Business Area, IS&GS group with the job titles of System Administrator, NDCAs, and Sr. NDCAs. (ECF No. 76-5 at 3). Melendrez describes maintenance as including "monitoring, root cause analysis, backups, antivirus, configuration." *Id.* at 123. Melendrez states that the employees perform: "Designing implementation. Not necessarily designing the program itself, but designing implementation of the actual program itself or whatever it is." *Id.* at 140-41. Melendrez states that System Administrators and NDCAs perform training which includes "[training] individuals on laptops, PCs, but it could also be used for training on the system itself." *Id.* at 145. Melendrez states that as part of the change management approval:

> Our process is just to send an e-mail with the change ... identify the change and just notify the management, and if there is a reason not to do it, then reply to the e-mail -- we'll reply to the individual who sent the e-mail, indicating not to do it or to move forward or whatever the appropriate response would be.

*Id.* at 160. Melendrez states that every two or three years the client performs "performance penetration testing and a number of other network related assessments to ensure that

1  [employees] are following Air Force guidelines." *Id.* at 137-38.

2       Plaintiff has submitted the deposition of Scot Norban who was designated as the person

3  most knowledgeable of the job duties for two proposed class members in the Enterprise

4  Business Services group with the job titles of NDCAs. (ECF No. 76-5 at 3). Norban describes

5  configuration as involving the IP address phones in the network such as "identif[ing] each

6  particular port, what functionality, if it was going to have a VLAN, virtual local area network

7  associated with it so it would only go to a specific environment in the network existing. And

8  testing and then implementation." *Id.* at 227. Norban states that the NDCAs "don't do the

9  hardware build, but they do the design of the infrastructure, what it would take for it to

10  function on the hardware itself." *Id.* at 237.

11       Plaintiff has submitted the deposition of Plaintiff Williams, who worked as a Sr.

12  NDCA. Plaintiff describes troubleshooting as figuring out what the problem is and "either

13  direct[ing] the problem to the right remedy group or consult[ing] with [one's] peers and correct

14  the issue." (ECF No. 76-5 at 421-22). Plaintiff states that troubleshooting is directed by others

15  and it did not include "mak[ing] a decision based on the reoccurring problem and offer[ing]

16  solutions for it not to happen again." *Id.* at 422.

17       Defendant has submitted the declaration of Douglas Gray, a System Administrator in

18  the enterprise Business Solutions Unix group servicing Lockheed Martin Aeronautics. (ECF

19  No. 80-5 at 7). Gray states that he "provided recommendations to [his] superiors and to the

20  customer .... he would review [the customer's] contract and determine the computer

21  specifications needed to fulfill the contract." *Id.* at 9. Gray states that he "worked

22  independently and with only general supervision." *Id.* at 11. Gray states: "Although [his]

23  work was assigned [by the team lead], once [he] got an assignment [he] normally used [his]

24  judgment to decide what needed to be done to complete the assignment." *Id.*

25       Defendant has submitted the declaration of Eugene Sonnen, a NDCA in the Enterprise

26  Business Services group servicing Lockheed Martin's Information Systems and Global

27  Solutions. (ECF No. 80-5 at 29). Sonnen states that he "provid[es] support to end users ..."

28  *Id.* at 29. Sonnen states in his declaration that he "train[s] and mentio[rs] individuals ... [and

he] oversee[s] these employees' work, provide[s] recommendations regarding key issues they have and plans they are making, provide direction as to how to resolve issues, and act as a filter to ensure that only their most critical problems are brought to the attention of [his] manager." *Id.* at 33. Sonnen states that his "designs and project plans are generally approved with limited changes or feedback from Lockheed Martin management." *Id.* at 30. Sonnen states that he is "afforded wide discretion in the performance of [his] job duties." *Id.* at 34.

Defendant has submitted the deposition of Michael Meyer who work as a System Administrator at the March Air Reserve Base and maintains servers operating on Windows systems. (ECF No. 81-5 at 3-5). Meyer states that he was "the interface between the client customer and the vendor [on a specialized weather system]." *Id.* at 14.

Defendant has submitted the deposition of Barbara Emerson who worked in the Theater High Altitude Area Defense group. (ECF No. 81-3 at 30-96). Emerson states in her deposition that she has written at least 70 documented procedures. *Id.* at 60.

## DISCUSSION

### I.    Federal Rule of Civil Procedure 23(b) Standard of Review

"As the party seeking class certification, [plaintiff] bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)); *see also Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 591 (9th Cir. 2010) ("[W]hether the suit is appropriate for class resolution must be actually demonstrated, not just alleged, to the district court's satisfaction."). Federal Rule of Civil Procedure 23(b) provides that a class action may be maintained if: (1) "prosecuting separate actions by or against individual class members would create a risk of ... inconsistent or varying adjudications ... or adjudications ... that, as a practical matter, would be dispositive of the interests of the other members not parties ... or would substantially impair or impede their ability to protect their interests"; (2) "the party opposing the class has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief

1    is appropriate respecting the class as a whole"; or (3) "the court finds that the questions of

2    law or fact common to class members predominate over any questions affecting only

3    individual members, and that a class action is superior to other available methods for fairly

4    and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(1)-(3).  "The Rule

5    23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to

6    warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

7    623 (1997); *see also Hanlon*, 150 F.3d at 1022.

8        In analyzing whether a plaintiff has met her burden to show that the above

9    requirements are satisfied, a court must "analyze[] the allegations of the complaint and the

10   other material before [the court] (material sufficient to form reasonable judgment on each

11   [Rule 23] requirement)." *Blackie v. Barrack*, 524 F.2d 891, 900-01 (9th Cir. 1975) (noting

12   that a court is to take the substantive allegations in the complaint as true); *see also Hanon*,

13   976 F.2d at 509; *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 233 (C.D. Cal. 2006).

14   "The Court is at liberty to consider evidence which goes to the requirements of Rule 23

15   even though the evidence may also relate to the underlying merits of the case." *In re Unioil*

16   *Secs. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985).  However, a court should not judge the

17   merits of the plaintiff's claims at the class certification stage. *See United Steel, Paper &*

18   *Forestry, Rubber, Mfg. Energy, Allied Indus. v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th

19   Cir. 2010); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1232 (9th Cir. 1996); *see also*

20   *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978).

21       A district court is granted "broad discretion" to determine whether the Rule 23

22   requirements have been met. *Zinser*, 253 F.3d at 1186; *see also In re Mego Fin. Corp. Sec.*

23   *Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) ("The district court's decision certifying the class

24   is subject to a very limited review and will be reversed only upon a strong showing that the

25   district court's decision was a clear abuse of discretion.") (quotations omitted).

26       The Court should consider "whether class certification would enhance efficiency

27   and further judicial economy." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935,

28   946 (9th Cir. 2009).  "An internal policy that treats all employees alike for exemption

purposes suggests that the employer believes some degree of homogeneity exists among the employees...." *See In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953, 957 (9th Cir. 2009). However, "uniform exemption policy says little about the main concern in the predominance inquiry: the balance between individual and common issues."[3] *Id.* at 959; *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (explaining that "a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry.") (citing *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953).

Generally, uniformity in work duties and experiences among class members may support a finding that common questions of law or fact predominate because it diminishes the need for individualized inquires. *See Vinole*, 571 F.3d at 947. Plaintiff may establish that common issues predominate "through the submission of employee declarations demonstrating that all class members share the same finite job duties ...." *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 243 (C.D. Cal. 2007) (citations omitted). In cases which involve a "*reasonably definite and finite list of tasks*" that the proposed class members perform, resolution of whether certain tasks should be classified as exempt or non-exempt may be proper for class determination because a court can "assig[n] each task to one side of the 'ledger' ...." *Sav-on Drug Stores, Inc. v. Superior Court,* 34 Cal. 4th 319, 330-31, 335 (emphasis added); *see also Jimenez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 251 n.9 (C.D. Cal. 2006) (citation omitted). The question of exemption turns on whether "defendants have made a common mistake with respect to all putative class members (i.e., treating a non-exempt task as exempt)." *Heffelfinger v. Electronic Data Systems Corp.*, Case No. CV 07-00101 MMM (Ex), 2008 WL 8128621 at *24 (C.D. Cal. Jan. 7, 2008).

---

[3] Plaintiff has submitted evidence that the sixty-four employees with job titles of System Administrators, NDCAs, and Sr. NDCAs were uniformly categorized as exempt. (ECF No. 76-5 at 277). The Court concludes that the proposed class members were uniformly categorized as exempt employees; however, the Court continues its inquiry into "the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litigation,* 571 F.3d at 959; *Vinole*, 571 F.3d at 946.

1    However, "in cases where exempt status depends upon an individualized

2    determination of an employee's work, and where plaintiffs allege no standard policy

3    governing how employees spend their time, common issues of law and fact may not

4    predominate." *Vinole*, 571 F.3d at 946-47; *see also In re Wells Fargo Home Mortg.*

5    *Overtime Pay Litigation*, 571 F.3d at 959 (explaining that the fact-finder may need to

6    "make a factual determination as to whether class members are actually performing similar

7    duties."). The question of exemption turns on the amount of time spent by class members

8    on certain tasks making individualized inquiries necessary. *Jimenez*, 238 F.R.D. at 251 n.9

9    (citing *Sav-on Drug Stores, Inc.,* 34 Cal.4th 330-31, 340); *see also Heffelfinger*, 2008 WL

10   8128621 at *24 ("Courts have declined to grant class certification ... where defendants have

11   adduced evidence that their exemption mistake was confined to individual employees or

12   differed across the proposed class."); *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 243

13   (C.D. Cal. 2007).

14   **II.    Administrative, Professional, and Computer Professional Exemptions**

15   The Administrative Exemption is defined as follows:

16   A person employed in an administrative capacity means any
     employee:  Whose duties and responsibilities involve ... The
17   performance of office or non-manual work directly related to
     management policies or general business operations of his/her
18   employer or his employer's customers[.]
     ...
19   Who customarily and regularly exercises discretion and independent
     judgment; and ... [w]ho performs under only general supervision
20   work along specialized or technical lines requiring special training,
     experience, or knowledge; or
21
22   Who executes under only general supervision special assignments
     and tasks; and
23   Who is primarily engaged in duties that meet the test of the
     exemption. The activities constituting exempt work and non-exempt
24   work shall be construed in the same manner as such terms are
     construed in the following regulations under the Fair Labor
25   Standards Act effective as of the date of this order: 29 C.F.R.
     Sections 541.201-205, 541.207-208, 541.210, and 541.215.
26   ...
     Such employee must also earn a monthly salary equivalent to no less
27   than two (2) times the state minimum wage for full-time
     employment. Full-time employment is defined in California Labor
28   Code Section 515(c) as 40 hours per week.

1  8 Cal Admin. Code §11040 (1)(A)(2).

2      29 C.F.R. § 541.201(a) provides:

> To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a). The requirement "that the employee 'customarily and regularly exercises discretion and independent judgment' also requires that such exercise of discretion and independent judgment pertain to 'matters of significance.'" *Combs v. Skyriver Communications, Inc.*,159 Cal. App. 4th 1242, 1264-65 (2008). "'[M]atters of significance' means the decision being made must be relevant to something consequential and not merely trivial." *In re United Parcel Service Wage and Hour Cases*, 190 Cal. App. 4th 1001, 1024 (2010).

The Professional Exemption is defined as an employee who meets all of the following:

> (a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or
> (b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:
> (i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or
> (ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and
> (iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or

physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.
(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).
(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

8 Cal. Admin. Code § 11040(1)(A).

The Computer Professional Exemption is defined as an employee in the computer software field who meets all of the following:

(1) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.
(2) The employee is primarily engaged in duties that consist of one or more of the following:
(A) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.
(B) The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.
(C) The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.
(3) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, or software engineering. A job title shall not be determinative of the applicability of this exemption.
(4) The employee's hourly rate of pay is not less than thirty-six dollars ($36.00) or, if the employee is paid on a salaried basis, the employee earns an annual salary of not less than seventy-five thousand dollars ($75,000) for full-time employment, which is paid at least once a month and in a monthly amount of not less than six thousand two hundred fifty dollars ($6,250). The Division of Labor Statistics and Research shall adjust both the hourly pay rate and the salary level described in this paragraph on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.

Cal. Labor Code § 515.5(a). The computer professional exemption does not apply to an individual who "is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment." Cal. Labor Code § 515.5(b)(3).

- 14 -

III.    **Whether There are Common Questions of Fact or Law**

In this case, the job descriptions for the job title Systems Administrator, NDCA, and Sr. NDCA contain broad statements regarding the function of the jobs including that the Systems Administrator "[m]aintains smooth operation of multi-user computer systems[]" and that NDCAs and Sr. NDCAs "[p]rovide[] problem resolution for all hardware and software elements of the data communication network and ensures the availability of the data network."(ECF No. 76-5 at 441-43). The Systems Administrator, NDCA, and Sr. NDCA job descriptions do not contain a finite list of reasonably definite tasks which are performed to meet these broad functions.

Ten proposed class members state that as part of their actual duties they primarily performed "the same repetitive tasks of installing, configuring, maintaining, monitoring, testing, and/or troubleshooting computer equipment, applications and/or hardware." (ECF No. 76-5 at 283, 288, 293, 298-99, 310, 315, 320, 325, 330,  335). The declarations also state they observed "the work performed by [their] fellow co-workers. As a result, [they] have observed that the other employees in [their] group all performed substantially similar tasks as [they] have described ...." *Id.* at 284, 289, 294, 299, 311, 316, 321, 326, 331, 336). However, the declarations do not describe the tasks that comprise "installing, configuring, maintaining, monitoring, testing, and/or troubleshooting computer equipment, applications and/or hardware." *Id.*

The evidence shows that the terms installation, configuration, troubleshooting, and maintenance contain a range of activities that potential class members perform.  Riticelli and Brown describe installation as involving ordering equipment, receiving equipment, tagging equipment, unboxing equipment, testing equipment, configuring equipment, patching the equipment, deploying equipment, and cabling equipment. *Id.* at 46, 180-81. However, Dotson describes installation as including "the securing of the operating system, preparing it for on the network, installing in applications that may reside on that server, and testing and ensuring that the server is performing as intended." *Id.* at 90, 105.  The evidence shows that the term installation includes tasks that range from equipment

1 | processing to ensuring that systems are operational.

2 |       Riticelli states that configuration is a "very broad term" and Riticelli describes
3 | configuration as determining appropriate connections and operating systems within routers
4 | which "could be as simple as maybe two lines of code or it's complicated with thousands of
5 | lines of changes, software changes." *Id*. at 183-84.   Riticelli also states that configuration
6 | could include "configuring ... solutions to optimize cost savings" and "coordinating
7 | network-orientated projects." *Id*. at 214.   Fabel describes configuration as involving an
8 | audit of systems to locate dozens or hundreds of services and turned off or closing services
9 | that are not needed. *Id*. at 253.   Brown states that configuration is "an analysis tool" and
10 | configuration involves "a lot of different things ... It could be just the whole design of how
11 | the whole system is going to work together...." *Id*. at 49.   The evidence shows that the
12 | term configuration includes tasks ranging from closing unnecessary services and
13 | implementing appropriate connections between systems to analysis, design, and
14 | coordination of projects to reduce costs.

15 |       Plaintiff Williams describes troubleshooting as figuring out what the problem is and
16 | "either direct[ing] the problem to the right remedy group or consult[ing] with [one's] peers
17 | and correct the issue." *Id*. at 421-22.   Plaintiff Williams states that troubleshooting does
18 | not include "mak[ing] a decision based on the reoccurring problem [or offering] solutions
19 | for it not to happen again." *Id*. at 422.   However, Fabel describes troubleshooting as a
20 | "problem diagnostic function[.]" *Id*. at 263.   Brown describes troubleshooting as involving
21 | a four step process of identifying a problem, resolving a problem, "analyzing ... the root
22 | cause of the problem[]," and document the root cause. *Id*. at 51.   Dotson states that after,
23 | "thoroughly diagnosing the issue" employees, "develop a plan," and "implement[] the
24 | plan." *Id*. at 98.   The evidence shows that the term troubleshooting includes tasks ranging
25 | from identifying a problem and directing it to others to performing root cause analysis,
26 | developing a plan, and resolving a problem.

27 |       Dotson describes maintenance as observing "key performance metrics of the server
28 | over a period of time to identify problems and when you identify those issues, ... and then

1  you would have to take that knowledge and understanding and develop a plan for
2  addressing it." *Id*. at 101, 108.  Melendrez describes maintenance as including
3  "monitoring, root cause analysis, backups, antivirus, configuration." *Id*. at 123.  The
4  evidence shows that the term maintenance includes tasks ranging from observing and
5  developing plans for systems to performing analysis, backup, and security measures.

6      The Court finds that the broad categories of work including installation, configuring,
7  troubleshooting, and maintenance, encompass varying tasks with varying levels of
8  complexity which are executed with varying levels of judgment.  The evidence fails to
9  show that the tasks performed by the proposed class members are "reasonably definite."
10 *Sav-on Drug Stores, Inc.,* 34 Cal. 4th at 330-31, 335; *see also Maddock*, 248 F.R.D. at 243;
11 *Jimenez,* 238 F.R.D. at 251 n.9.  The Court concludes that individual inquiries are
12 necessary to determine whether class members are actually performing similar duties.  *See*
13 *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d at 959.

14     The evidence also shows that proposed class members perform tasks in addition to
15 the broad categories of work including installation, configuration, troubleshooting, and
16 maintenance.  Brown states that proposed class members participate in designing systems.
17 (ECF No. 76-5 at 43, 60).  Melendrez states that the employees perform: "Designing
18 implementation. Not necessarily designing the program itself, but designing
19 implementation of the actual program itself or whatever it is." *Id*. at 140-41.  Norban states
20 that the NDCAs "don't do the hardware build, but they do the design of the infrastructure,
21 what it would take for it to function on the hardware itself." *Id*. at 237.  The evidence
22 shows that proposed class members participated in design.

23     Riticelli states that network planning and design involves "sit[ting] down with the
24 clients to review their requirements for new facilities, along with the facilities people, ...
25 [and] determin[ing]  the correct equipment that's needed, have that reviewed, purchase the
26 equipment, evaluate, install, plan that out, execute it, [and] initiate it." *Id*. at 176.  Fabel
27 states that employees "respond to customer requests to evaluate upgrading servers and
28 software ...." *Id*. at 241.  Meyer states that he was "the interface between the client

customer and the vendor [on a specialized weather system]." (ECF No. 81-5 at 14).  Gray states that he "provided recommendations to [his] superiors and to the customer .... he would review [the customer's] contract and determine the computer specifications needed to fulfill the contract." (ECF No. 80-5 at 9).  Sonnen states that he "provid[es] support to end users ..." *Id*. at 29.  The evidence shows that proposed class members interacted with and assisted the customer.

Brown states that as policies are drafted, "input is requested [from System Administrators] as a normal part of instituting or writing any policy or even changing a policy." (ECF No. 76-5 at 82).  Emerson states in her deposition that she has written at least 70 documented procedures. (ECF No. 81-3 at 60).  The evidence shows that proposed class members participated in policy drafting.

Melendrez states that System Administrators and NDCAs perform training which includes "[training] individuals on laptops, PCs, but it could also be used for training on the system itself." (ECF No. 76-5 at 145).  Fabel states that employees are "involved with training, documenting operations processes, providing documentation to users on how to use a particular environment." *Id*. at 241.  Sonnen states that he "train[s] and mentio[rs] individuals ... [and he] oversee[s] these employees' work, provide[s] recommendations regarding key issues they have and plans they are making, provide direction as to how to resolve issues, and act as a filter to ensure that only their most critical problems are brought to the attention of [his] manager." (ECF No. 80-5 at 33).  The evidence shows that proposed class members participated in training.

The Court finds that, in addition to the broad categories of work including installation, configuration, troubleshooting, and maintenance, there is evidence that proposed class members participate in design, assist the customer, draft policies, and participate in training.  The additional tasks also encompass varying tasks with varying levels of complexity and are executed with varying levels of judgment.  In this case, the evidence also shows that the tasks actually performed by proposed class members differs across the proposed class. *See Heffelfinger*, 2008 WL 8128621 at *24.  Therefore, the

1   question of exemption turns on the nature of the tasks actually performed by class

2   members.   *See Jimenez*, 238 F.R.D. at 251 n.9 (citing *Sav-on Drug Stores, Inc.*, 34 Cal.4th

3   330-31, 340).  The Court concludes that the individualized inquiries are necessary to

4   determine whether class members were properly categorized as exempt.  *See In re Wells*

5   *Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d at 959.

6           Although the need for individual inquiry may be reduced by the presence of

7   centralized control or "standard policy governing how employees spend their time[,]"the

8   evidence fails to show that there is centralized control or standard policies governing the

9   employee's time in this case.  *Vinole*, 571 F.3d at 946-47.  The job descriptions for Systems

10  Administrators, NDCAs, and Sr. NDCAs allow for a range of duties.  The Systems

11  Administrator's job description states: "Duties *may include* setting up administrator and

12  service accounts, maintaining system documentation, tuning system performance, installing

13  system wide software and allocate mass storage space.  Interacts with users and evaluates

14  vendor products.  Makes recommendations to purchase hardware and software, coordinates

15  installation and provides backup recovery.  Develops and monitors policies and standards

16  for allocation related to the use of computing resources." (ECF No. 76-5 at 441) (emphasis

17  added).  The NDCA and Sr. NDCA job descriptions each state:

18              Defines network communications and designs and implements
            solutions within existing network.  Manages load configuration of
19          central data communication processor and makes recommendations
            for upgrade of data networks.  Evaluates and reports on new analog
20          and digital communications technologies to enhance the capabilities
            of the data network....  Proposes solutions to management to provide
21          all data communications requirements are based upon future needs
            and current usage, configuring such solutions to optimize cost
22          savings.  May coordinate network-oriented projects.

23  *Id*. at 442-43.  The job descriptions do not create centralized control over the work of the

24  potential class members.  The job descriptions also do not contain a standard policy

25  governing how employees spend their time.

26          With regard to the 'change control' procedure used by Defendant, Riticelli

27  states that it is "a process ... to notify a group of people that a network -- a network change

28  is going to happen. And that's regardless of any network change. That is not just network

1   but anybody else in the computer world that needs to make a change." (ECF No. 76-5 at
2   187). Brown states that a change control board is, "really less of an approval, even though
3   an approval comes out on the back end as more of a way to communicate ... what needs to
4   be changed and why." *Id.* at 71. The change control policy does not create centralized
5   control over the work of the potential class members. The change control policy also does
6   not contain a standard policy governing how employees spend their time.
7        With regard to guidelines and audits that potential class members follow, Riticelli
8   states that "[t]here's certain instructions that we have that certain things can't happen
9   within the switch, accessibility." (ECF No. 76-5 at 193). Dotson states that with regards to
10  client requirements for backing-up files: "They have guidelines, but not specific
11  requirements. *Id.* at 100. Melendrez states that every two or three years the client performs
12  an inspection to ensure guidelines regarding threats and efficiencies are met. *Id.* at 137-38.
13  Brown states that there are "internal audits, external audits, [and] government audits." *Id.*
14  at 66.  The guidelines and audits do not create centralized control over the work of the
15  potential class members. The guidelines and audits also do not contain a standard policy
16  governing how employees spend their time.
17       In addition, Defendant has submitted evidence that employees worked under varying
18  degrees of supervision. Gray states that he "worked independently and with only general
19  supervision." (ECF No. 80-5 at 11). Gray states: "Although [his] work was assigned [by
20  the team lead], once [he] got an assignment [he] normally used [his] judgment to decide
21  what needed to be done to complete the assignment." *Id.* Sonnen states that he is "afforded
22  wide discretion in the performance of [his] job duties." *Id.* at 34. The varying degrees of
23  supervision indicates that Defendant does not exercise centralized control over the work of
24  the potential class members or assert a standard policy governing how employees spend
25  their time. The Court finds that, the need for individual inquiry is not reduced by the
26  presence of centralized control or "standard policy governing how employees spend their
27  time[.]" *Vinole*, 571 F.3d at 946-47.
28  //

09cv1669 WQH (POR)

## SUMMARY

The proposed class members perform broad categories of work including installation, configuring, troubleshooting, and maintenance, which encompass varying tasks with varying levels of complexity and are executed with varying levels of judgment.  In addition to these broad categories of work, proposed class members participate in design, assist customers, draft policies, and participate in training which also encompass varying tasks with varying levels of complexity and are executed with varying levels of judgment. Individual inquiries are necessary to determine whether class members are properly categorized as exempt and the need for individual inquiry is not reduced by the presence of centralized control or standard policies governing how employees spend their time.  The Court concludes that the requirements of Rule 23(b) have not been met because common questions of law or fact do not predominate over questions affecting the individual members of the proposed class.  *See* Fed. R. Civ. P. 23(b)(3).  Accordingly, the Motion for Class Certification (ECF No. 76) is denied.

## EXPERT REPORT

Defendant requests that the Court strike the expert report of Miles E. Locker ("Locker") submitted by Plaintiff on the grounds that Locker's opinions are merely conclusions as to the ultimate legal issues in the case.  "Locker's 'expert' opinions ... are based entirely on documents, deposition testimony, opinion letters, and case law that are well within the comprehension of this Court in ruling on Plaintiff's Motion, and are therefore superfluous and unnecessary." (ECF No. 77-1 at 2).  Defendant contends that Locker is "no more of an authority on [the labor code and the IWC Wage Orders] than the Court or any other attorney." *Id.* at 3.

Plaintiff contends that Locker's expert report is "useful and helpful" to the Court on the grounds that it demonstrates how common questions predominate this case and explains the trial plan.  Plaintiff contends that Locker's opinions properly discuss how Defendant's employment practices fail to meet the standard of care in classifying the employees as exempt.  Plaintiff also contends that Locker is qualified to serve as an expert.

1    Where an expert report is challenged at the class certification stage, the Court should

2    not "apply the full [*Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)]

3    'gatekeeper' standard ..." *Dukes v. Wal-Mart, Inc.,* 222 F.R.D. 189, 191 (N.D. Cal. 2004).

4    The Court should consider "whether the expert evidence is sufficiently probative to be

5    useful in evaluating whether class certification requirements have been met." *Id.*

6    "Although this standard is 'more lenient,'" the Court "'must ensure that the basis of the

7    expert opinion is not so flawed that it would be inadmissible as a matter of law.'" *In re*

8    *First American Corp. ERISA Litigation*, Case Nos. SACV 07-01357-JVS (RNBx), CV

9    07-07602; CV 07-07585, SACV 08-00110, 2009 WL 928294, at * 1 (C.D. Cal. Apr. 2,

10   2009) (citations omitted). "Where an 'expert report' amounts to 'written advocacy ... akin

11   to a supplemental brief,' a motion to strike is appropriate because this evidence is not

12   useful for class certification purposes." *Id.* (citations omitted).

13        The Locker expert report provides a summary of the evidence and the law in this

14   case and provides opinions to the following nine questions:

15            Whether all members of the class were uniformly classified by the
             Defendant as Exempt; (2) Whether the tasks primarily performed by
16            the class members ... consisted of installing, maintaining,
             configuring, monitoring, testing and troubleshooting computer
17            equipment, computer applications, computer hardware and/or
             computer networks; (3) Whether the work performed by the class
18            members did not require them to complete a prolonged course of
             specialized intellectual instruction and possess an advanced
19            academic degree; (4) Whether the class members do not qualify for
             the learned profession exemption because they were not required to
20            complete a prolonged course of specialized intellectual instruction
             and possess an advanced academic degree; (5) Whether the class
21            members do not qualify for the computer professional exemption
             because they were engaged in the maintenance of computer hardware
22            and related equipment; (6) Whether the class members do not qualify
             for the computer professional exemption because they were not
23            compensated in accordance with the requirements of the exemption;
             (7) Whether the class members do not qualify for the administrative
24            exemption because they were not primarily engaged in work that was
             directly related to the management policies or general business
25            operations of the Defendant or the Defendant's customers; (8)
             Whether the class members do not qualify of the administrative
26            exemption, the learned professional exemption, or the computer
             professional exemption because they did not customarily and
27            regularly exercise discretion and independent judgment within the
             meaning of those exemptions; and (9) Whether the class members
28            were properly classified as exempt employees.

1  (ECF No. 76-2 at 19-23).  With regard to class certification, Locker opines: "The

2  determination of what tasks were performed by class members can be made through a

3  common set of questions.  The determination of which of these tasks are exempt, and which

4  are not, presents a predominant common question that is appropriately answered on a class-

5  wide basis."  *Id*. at 20.

6      Locker's report offers opinions on legal conclusions regarding issues to be decided

7  by the Court.  The Court finds that Locker's expert report "amounts to written advocacy."

8  *In re First American Corp. ERISA Litigation*, 2009 WL 928294, at *1.  The report did not

9  assist the Court.  Accordingly, Motion to Strike the Expert Report of Miles E. Locker (ECF

10  No. 77) is granted.

11                          **CONCLUSION**

12      The Motion for Class Certification (ECF No. 76) filed by Plaintiff is **DENIED**.  The

13  Motion to Strike the Expert Report of Miles E. Locker (ECF No. 77) filed by Defendant

14  Lockheed Martin Corporation is **GRANTED**.

15

16  DATED: _6/1/11_

17                                      **WILLIAM Q. HAYES**
                                        United States District Judge

18

19

20

21

22

23

24

25

26

27

28